IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DANIEL CHAMBERS,           :

      Plaintiff,

   v.                   :     Case No. 3:11-cv-459

RELIANCE STANDARD LIFE         JUDGE WALTER H. RICE
INSURANCE COMPANY,

      Defendant.       :

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD (DOC. #10) AND
SUSTAINING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD (DOC. #11); JUDGMENT TO ENTER IN
FAVOR OF PLAINTIFF AND AGAINST DEFENDANT; TERMINATION
ENTRY

---

Plaintiff Daniel Chambers filed suit against Defendant Reliance Standard Life

Insurance Company, challenging the termination of his long-term disability benefits.

He brings his claim under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  The parties have filed cross-motions for

judgment on the administrative record.  Docs. ##10, 11.

The Court finds that Defendant acted arbitrarily and capriciously in

terminating Plaintiff's long-term disability benefits.  Accordingly, Plaintiff's Motion

for Judgment on the Administrative Record, Doc. #11, is sustained, and

Defendant's Motion for Judgment on the Administrative Record, Doc. #10, is

overruled.

I.      **Background and Procedural History**

Daniel Chambers was employed by United Dairy Farmers ("UDF") from 1988 to 2006, most recently as the Dayton Zone Manager for several UDF stores.  He was a participant in UDF's group long-term disability plan (the "Plan"), an employee benefit plan administered by Reliance Standard Life Insurance Company ("Reliance"), and governed by ERISA.

Chambers, who had been diagnosed with human immunodeficiency virus ("HIV") in 2001, took a medical leave of absence in June of 2006.  AR 805.  Although he returned to work for a brief period of time late that summer, he was unable to work at all after September 20, 2006.  He received short-term disability benefits for 13 weeks.  AR 752.

Then, in December of 2006, Chambers submitted an application for long-term disability benefits, stating that the pain from the peripheral neuropathy related to the HIV made it difficult for him to get out the house, drive, sit, or stand.  AR 801.  He had also been diagnosed with chronic pain syndrome, bipolar disorder, and tropical sprue, a digestive disorder.  AR 495.  To control these conditions, he took more than a dozen different daily medications.  AR 807.

Reliance approved Chambers's application for long-term disability benefits. Under the terms of the Plan, he was considered "totally disabled" and entitled to disability benefits for 36 months if he was unable to "perform the material duties of his/her regular occupation."  But after 36 months, benefits would continue only

2

if he could not "perform the material duties of *any* occupation." AR 12 (emphasis added).

In November of 2007, Reliance threatened to terminate his benefits after a Functional Capacities Evaluation ("FCE") indicated that he was able to tolerate full-time, medium demand work; Chambers's position as a UDF manager was classified as a light demand job. In response, his treating physician, Jerry Clark, M.D., submitted a letter stating that Chambers "suffers from HIV related severe incapacitating peripheral neuropathy and has chronic pain syndrome requiring polypharmacy including daily ongoing morphine." Dr. Clark noted that the pain and quality of life were worse when Chambers was working and traveling. AR 616.

In March of 2008, Reliance requested a second FCE. Although this FCE concluded that Chambers was capable of full-time, light demand work, Reliance nevertheless instead found that "[s]edentary restrictions and limitations are supported," and that Chambers was "[u]nlikely to improve." Reliance therefore agreed to continue to pay long-term disability benefits. AR 545-47.

In November of 2009, the Social Security Administration found that Chambers was totally disabled and approved his application for monthly disability benefits. AR 477.

In August of 2010, Reliance notified Chambers that it was going to review his eligibility for continued long-term disability benefits under the Plan's stricter standard, which required him to prove that he could not perform the material duties of *any* occupation that his training, education or experience would

3

reasonably allow. AR 473-74. Chambers completed a questionnaire and submitted updated medical records. He claimed that he was able to do very little. He stated that his neuropathy, chronic pain, and the side effects from the medications prevented him from returning to work. AR 443.

Reliance found that Chambers's subjective complaints were inconsistent with his most recent medical records. His treating psychiatrist, Christina Waite, M.D., had previously diagnosed him with bipolar disorder, "chronic pain disorder secondary both to psychological factors and general medical condition," and "generalized anxiety disorder." She also noted that he was marijuana dependent. When Dr. Waite saw Chambers in February of 2010, she noted that he was "doing well," that his mood was stable and he was sleeping well. He was planning to go on a cruise. He had increased pain because his insurance no longer covered Metanx, one of the medications for his neuropathy. She noted that he was taking Abilify, Ambien, and Lamictal, and had no side effects from the medications. AR 438-39.

Dr. Waite's notes from an office visit in May of 2010 again indicate that Chambers is "doing well both in his relationship and medically stable." AR 440. In August of 2010, Dr. Waite noted that Chambers was "on methadone and his sedation is gradually resolving and he has very good pain relief." His mood was stable and he was sleeping well. AR 436.

Robert Brandt, Jr., M.D., is one of Chambers's primary care physicians. He specializes in the treatment of HIV/AIDS. Dr. Brandt's notes from August of 2010

4

indicate that the HIV was "stable," and Chambers was "doing ok for now with the methadone . . . still has some trouble feeling sleepy." The notes further indicate that "[p]ain control is good, but tired and some constipation. Has painful area on right foot. Otherwise no complaints." AR 449.

On October 11, 2010, Reliance notified Chambers that he was no longer eligible to receive disability benefits under the Plan. The letter stated that based on the information received from Dr. Waite and Dr. Brandt, "we determined that while your physical conditions prevent a return to work in your normal occupation, you appear capable of sedentary work activity. While your psychiatric condition would prevent a return to work it would be subject to [certain] policy limitations." The letter noted that benefits for disabilities "caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months." AR 408-11.

Chambers appealed the termination of benefits. In support of the appeal, he submitted a letter from Dr. Brandt, dated March 22, 2011. Dr. Brandt stated that, although Chambers may be able to perform a sedentary job for 10-20 hours per week, he was not able to work full time in any occupation. Chambers's chronic fatigue prevented him from performing adequately in any physical capacity for more than 4 hours per day, and his persistent pain from the peripheral neuropathy was only moderately controlled. Dr. Brandt noted that the pain "would certainly impair his ability to concentrate and focus on any given tasks." According to Dr. Brandt, the medications Chambers was taking, particularly the methadone, Lyrica

5

and Abilify, caused fatigue and lethargy, and further impaired his ability to concentrate and think clearly. Dr. Brandt stated that, because of "chronic fatigue from AIDS and the medications that are taken throughout the day," Chambers experienced lethargy and fatigue all day long, although it tended to be worse in the mornings. AR 364-65.

After reviewing Dr. Brandt's letter, Dorothy McGarry, a nurse case manager for Reliance, recommended that Chambers be referred to an infectious disease specialist for an independent medical examination to further clarify his "current function and future prognosis for return to work." AR 242. Nevertheless, because of scheduling difficulties, Reliance instead referred Chambers to David Randolph, M.D., an occupational medicine specialist. AR 288.

Dr. Randolph examined Chambers and reviewed his medical records. On July 9, 2011, he concluded that, from a physical standpoint, Chambers "should be capable of returning to work in at least a light physical demand characteristic level." He found that Chambers's subjective complaints could not be verified, and that the AIDS diagnosis referred to by Dr. Brandt was not "entirely objectively substantiated." Dr. Randolph noted that, although Chambers had been prescribed a large number of medications, there was no urinary drug screen to verify that he was actually taking them. Dr. Randolph acknowledged that, assuming that Chambers was taking the medications that had been prescribed, fatigue could be an issue. He also noted, however, that the marijuana that Chambers was using on a daily basis, allegedly to ease the pain from the peripheral neuropathy, could also

6

account for the fatigue.  Dr. Randolph found it "odd" that, although Chambers complained that he did not have enough money to pay for some of his medications, Dr. Waite's records indicated that Chambers was taking a cruise.  AR at 294-305.

After receiving Dr. Randolph's report, Reliance asked him to more specifically address the question of whether Chambers's fatigue and/or medication side effects would preclude consistent work function.  In an addendum, dated July 24, 2011, Dr. Randolph stated that there was nothing in the objective clinical record to support a conclusion that the fatigue and side effects from the medication would preclude consistent work function.  He found Dr. Brandt's contrary opinion "completely unsubstantiated from an objective prospective [sic]." He again noted the lack of medical records to support the diagnoses of peripheral neuropathy and AIDS, and the absence of a urinary drug screen to demonstrate that Chambers was taking the medications that had been prescribed.  According to Dr. Randolph, the records indicated that Chambers "is participating in a variety of activities of daily living and seems quite capable of doing so when he is so motivated."  AR at 321-23.

On August 31, 2011, Reliance denied Chambers's appeal, and terminated his long-term disability benefits effective October 24, 2010.  Relying heavily on Dr. Randolph's report and addendum, Reliance concluded that, from a physical standpoint, Chambers was capable of full-time, sedentary work.  AR 286-93.

7

Chambers has filed suit, seeking a judicial review of Reliance's decision pursuant to 29 U.S.C. § 1132(a)(1)(B). That section of ERISA allows a plan participant to bring a civil action to recover benefits due to him under the terms of the employee benefit plan. Chambers asks the Court to restore his long-term disability benefits.

## II.    Standard of Review

In *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), the Sixth Circuit held that, in adjudicating a claim for benefits under ERISA, summary judgment procedures are inapplicable. Rather, the Court must review the administrative record and make findings of fact and conclusions of law. *Id.* at 619 (Gilman, J., concurring in the judgment and delivering the opinion of the Court on the summary judgment issue).

Because the Plan at issue grants Reliance "discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits," AR 16, the Court does not review Reliance's decision to terminate benefits *de novo.* Rather, the Court must uphold it unless it is "arbitrary and capricious." *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"). Even though the evidence may be sufficient to support a finding of a disability, the

8

decision must be upheld "if there is a reasonable explanation for the administrator's decision." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

"This standard is the least demanding form of judicial review of administrative action. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious. . . . Consequently, a decision will be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (internal quotations and citations omitted).

Accordingly, the court must review not only the outcome, but the reasoning behind it. *Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007). Rather than rubber stamping the administrator's decision, the court must review the "quality and quantity of the medical evidence and the opinions on both sides of the issues." *Evans*, 434 F.3d at 876 (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Where, as here, the insurer is charged with determining eligibility *and* paying benefits, an inherent conflict of interest exists because the insurer has a financial incentive to deny claims. The Court must consider this conflict in reviewing the decision. *Id.*

9

### III.    Analysis

Chambers maintains that Reliance's decision to terminate his long-term disability benefits was arbitrary and capricious.  He argues that Reliance largely ignored the opinion of Dr. Brandt, his treating physician, in favor of the flawed opinion of Dr. Randolph, who had little experience treating patients with HIV/AIDS. He further argues that Reliance "cherry picked" the medical records to support its finding that Chambers was not "totally disabled."  He notes that Reliance's determination on this issue is inconsistent with that of the Social Security Administration.

Chambers also argues that he was denied a full and fair review of his claim. He contends that he should have been given the opportunity to respond to the issues raised for the very first time in Dr. Randolph's report and addendum, concerning the lack of medical evidence to support certain diagnoses, and the lack of a urinary drug screen to show that Chambers was actually taking the medications that caused the side effects that impacted his ability to work. Chambers maintains that Reliance should not be permitted to shift its rationale for denying his claim in the midst of the final appeal process.

### A.    Arbitrary and Capricious

#### 1. Effect of Social Security Disability Determination

As previously noted, in November of 2009, the Social Security Administration ("SSA") found that Chambers was totally disabled, effective March of 2007.  AR 477.  The parties agree that this determination is not binding on

10

Reliance and, standing alone, the fact that Reliance reached a different conclusion

does not render its decision arbitrary and capricious.  Nevertheless, in *Bennett v.*

*Kemper National Services, Inc.*, 514 F.3d 547 (6th Cir. 2008), the court held that,

> if the plan administrator (1) encourages the applicant to apply for
> Social Security disability payments; (2) financially benefits from the
> applicant's receipt of Social Security; and then (3) fails to explain why
> it is taking a position different from the SSA on the question of
> disability, the reviewing court should weigh this in favor of a finding
> that the decision was arbitrary or capricious.

*Id.* at 554 (citing *Glenn v. MetLife*, 461 F.3d at 660, 669 (6th Cir. 2006)).

It appears to be undisputed that Reliance encouraged Chambers to apply for

Social Security disability benefits.  AR 486-87, 688, 706, 717, 723.  Moreover,

because the Plan allowed Reliance to offset its own benefits against any Social

Security benefits obtained, Reliance also benefited financially from the award.  AR

717.  Chambers admits that Reliance made *some* attempt to explain why its

position was contrary to that of the SSA, but argues that the explanation given is

unconvincing.  In the initial termination letter, Reliance attempted to justify the

inconsistent results by explaining that: (1) the relevant guidelines for determining

total disability may be different; and (2) "each benefit provider may be considering

different medical evidence in the evaluation of a claim."  AR 292.

Chambers points out, however, that the SSA's test for establishing "total

disability" is substantially similar to the Plan's definition of that term.  The Plan

requires Chambers to show that he "cannot perform the material duties of any

11

occupation." AR 12. The SSA requires him to show that he is unable to do any "other work." 20 C.F.R. § 404.1520(a)(4)(v).

In response to this argument, Reliance argues that Chambers overlooks the fact that the Plan limits benefits for disabilities "caused by or contributed to by mental or nervous disorders" to 24 months; after that, he must show that he is disabled from a purely physical standpoint. Chambers's doctors had previously attributed a portion of his chronic pain syndrome to psychological factors. Reliance impliedly attributes the differing outcomes to the fact that the SSA could consider physical *and* mental disorders, while Reliance could consider only physical disorders in determining if Chambers was "totally disabled."

Reliance also explains that the SSA may have considered different medical evidence than did Reliance. The SSA did not have Dr. Randolph's report available in November of 2009, when it rendered its decision. Reliance has opined that if the SSA had the benefit of Dr. Randolph's report and addendum, along with other vocational and medical evidence contained in Reliance's file, the SSA "may well have reached a different conclusion." AR 292. Chambers argues, however, that this comment simply underscores the importance that Reliance placed on Dr. Randolph's opinion which, as discussed in detail below, Chambers maintains was seriously flawed in several respects.

Because Reliance offered some plausible explanation of why it took a position different from the SSA on the question of total disability, *Bennett* appears to be inapplicable. Nevertheless, the fact that the SSA found Chambers to be

12

totally disabled remains a significant factor to be considered in the determination of whether Reliance acted in an arbitrary and capricious manner in terminating long-term disability benefits. *See Glenn*, 461 F.3d at 667-68.

### 2. Medical Evidence

In order to continue receiving long-term disability benefits under the Plan, Chambers had to show that he was unable to perform the material duties of *any* occupation. Reliance denies that it acted in an arbitrary and capricious manner in finding that he was capable of working full-time in a sedentary position. It argues that the decision to terminate long-term disability benefits was the result of a deliberate, principled reasoning process and was supported by substantial evidence, including Dr. Randolph's independent medical examination, report and addendum, the FCEs, and comments contained in Chambers's medical records.

Chambers disagrees. He particularly takes issue with the fact that Reliance gave so little weight to the opinion of his treating physician, Dr. Brandt, who specializes in the treatment of patients with HIV/AIDS. In his March 22, 2011, letter, Dr. Brandt stated that Chambers is unable to work full-time in *any* capacity due to chronic fatigue from HIV/AIDS, persistent pain from peripheral neuropathy, and side effects from his various medications. AR 364-65. The Sixth Circuit has held that "the plan administrator need not accord special deference to the opinion of a treating physician. By the same token, it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn*, 461 F.3d at 671.

13

Chambers notes that after receiving Dr. Brandt's letter in support of his appeal, Reliance's nurse-case manager recommended that Chambers be evaluated by an infectious disease specialist.  AR 242.  Instead, Reliance referred him to Dr. Randolph, an occupational medicine specialist with no experience treating patients with HIV/AIDS.  Reliance asked Dr. Randolph to review the medical records and conduct an independent medical examination "to determine the claimant's restrictions and limitations, if any, as of 10/24/10 . . . Please comment on whether or not the claimant's medication usage or side effects would impact work function or work impairment and, if so, to what extent."  Reliance noted that because the 24-month term limitation for disabilities based on mental disorders had expired, it was "seeking an assessment of the claimant's physical condition in the absence of any psychiatric contribution."  AR 299.

Chambers maintains that Dr. Randolph's report and addendum were flawed in many respects, and that Reliance acted in an arbitrary and capricious manner in relying so heavily on them.  Chambers contends that, in order to discredit Dr. Brandt's opinion and support their own findings that Chambers was capable of full-time sedentary work, Dr. Randolph and Reliance "cherry-picked" the medical records.  The Court agrees.

Reliance argues that Dr. Brandt's March 22, 2011, letter is inconsistent with his treatment records from August and September of 2010, which indicated that Chambers's HIV was "stable" and his pain control was "good."  AR 449.  Reliance accuses Dr. Brandt of changing his position in order to help Chambers retain his

14

disability benefits.  It argues that because Dr. Brandt was acting "more as an advocate than a doctor rendering objective opinions," it was entitled to give his opinion less weight.  *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006).

In arguing that Dr. Brandt's letter is inconsistent with his previous treatment notes, Reliance completely ignores Dr. Brandt's other office notes from September of 2010, which indicate that Chambers has a "big problem with lethargy . . . especially in the AM  . . . takes until 10-noon for him to wake up . . . although he says he gets adequate sleep. . . Pain still worse in the AM" and that Chambers is "doing OK for now with methadone . . . Still has some trouble feeling sleepy."  AR 447.  Again, in November of 2010, Dr. Brandt noted that Chambers was "[t]ired with meds, drowsy with methadone sometimes," and "[w]aist down seems to be getting pins and needles sensation . . . can wake him up at night."  AR 371.  In April of 2011, Dr. Brandt noted that "[p]ain is stable, but always present . . . able to cope moderately."  AR 371.

These office notes are entirely consistent with Dr. Brandt's March 22, 2011, letter and, as Chambers points out, they reflect ongoing problems with neuropathy, chronic pain, and lethargy.  When viewed in the larger context of Chambers's medical condition, Dr. Brandt's notes that Chambers's HIV was "stable" and his pain control was "good" are not necessarily inconsistent with the conclusion that Chambers is not capable of full-time work.  The Court therefore rejects Reliance's

15

claim that the conclusions contained in Dr. Brandt's March 22, 2011, letter are not supported by his previous treatment notes.

Dr. Randolph and Reliance also "cherry-picked" the medical records of Dr. Waite, Chambers's treating psychiatrist. Her treatment notes from August 10, 2010, read as follows:

> **Interim History:** Doing very well in his relationship now over one year duration. He is on methadone and his sedation is gradually resolving and he has very good pain relief. He is about to take a Mediterranean 2-week cruise. Mood is stable. He is sleeping well.
>
> **Medications:** Ambien 10 mg, Abilify 15 mg nightly, Lamictal 200 mg daily and Metanx one tablet daily (not covered by insurance) but he resumed it again because clearly helps him.
>
> **Medication Side Effects:** None endorsed.

AR 436.

Reliance focuses on the note indicating that Chambers's "sedation is gradually resolving and he has very good pain relief." In an attempt to discredit Dr. Brandt's opinion, Reliance also focuses quite heavily on Dr. Waite's note that Chambers experienced no side effects from the medication he was taking. As Chambers points out, however, Dr. Waite's comment must be read to mean only that he complained of no side effects from the medications she had listed, *i.e.*, Ambien, Abilify, Lamictal, and Metanx.

Dr. Brandt's letter, on the other hand, indicates that the majority of the side effects that cause fatigue and lethargy, and impact Chambers's ability to work full-time, "come from his methadone, Lyrica and Abilify." AR 364. Admittedly, there

16

appears to be a difference of opinion with respect to side effects caused by Abilify. However, with respect to the methadone, Dr. Waite's notes specifically acknowledge that Chambers had problems with "sedation," which were "gradually resolving," and her notes say nothing about possible side effects from Lyrica.  As noted above, Dr. Brandt's treatment notes from September of 2010 refer to "big problems with lethargy," and, in connection with the methadone, "trouble feeling sleepy."  AR 447, 449.  Two months later, Chambers was still "[t]ired with meds, drowsy with methadone sometimes."  AR 371.  These side effects are clearly documented in the medical records, but largely overlooked by Dr. Randolph and by Reliance.

Reliance also argues that nothing in the medical records indicates that Chambers ever complained about an inability to concentrate or think clearly.  Dr. Brandt, however, opines that the pain "would certainly impair his ability to concentrate and focus on any given tasks," and that the medication side effects "impair his ability to concentrate and think clearly."  AR at 364.  Although Chambers may not have complained about these particular side effects, Dr. Brandt, as his treating physician, is clearly qualified to offer his assessment of how the chronic pain and medications would negatively impact Chambers's ability to work.

Notably, Reliance's denial of Chambers's appeal appears to rely almost entirely on Dr. Randolph's report and addendum.  Reliance explained that "Dr. Randolph has stated that Mr. Chambers's alleged medication side effects and fatigue are not supported through the available medical records.  As such, given

17

the opinion expressed in the original IME report and addendum, Mr. Chambers would be capable of returning to the workplace in a full-time[,] Sedentary occupation." AR 291.

In order to conclude that the side effects and fatigue were not supported by available medical records, Dr. Randolph and Reliance had to go out of their way to ignore substantial evidence to the contrary. The medical records clearly document Chambers's ongoing problems with persistent pain, lethargy and fatigue.

In *Metropolitan Life Insurance Company v. Conger*, 474 F.3d 258 (6th Cir. 2007), the court held that "an administrator abuses its discretion when it . . . engages in a selective review of the administrative record to justify a decision to terminate coverage." *Id.* at 265 (internal quotation omitted). The court found that "the administrator, in reviewing the insured's medical records, focused on slivers of information that could be read to support a denial of coverage and ignored— without explanation—a wealth of evidence that directly contradicted its basis for denying coverage." *Id.* The court concluded that "[s]uch a decision-making process is not deliberate or principled, and the explanation provided was far from reasoned, as it failed to address any of the contrary evidence." *Id.* The same can be said of Reliance's termination of Chambers's long-term disability benefits.

As Chambers notes, Dr. Randolph essentially skirted the question Reliance had posed -- whether the fatigue and side effects from the medication would preclude consistent work function. Dr. Randolph admitted that, if Chambers were taking the medications prescribed, fatigue could be an issue, but he disagreed with

18

Dr. Brandt's assessment of Chambers's ability to work. Dr. Randolph cited the FCEs from three years earlier, which found Chambers to be capable of light demand work. Although the FCEs do provide some basis of support, it does not appear that Chambers was taking methadone or Abilify at the time. AR 557. Therefore, the FCEs do not speak to the question of whether the side effects from these medications would preclude consistent work function.

Rather than articulating a principled basis for his disagreement with Dr. Brandt's opinion, Dr. Randolph instead chose to raise new questions about whether the medical diagnoses of peripheral neuropathy and AIDS were fully supported by the record, and whether Chambers was actually taking the medication that had been prescribed. Certainly, if Dr. Randolph had questions about the diagnoses, or had some reason to suspect that Chambers was not taking the medications at issue, he could have easily consulted with Chambers's treating physicians. He failed to do so.

The Court finds that Reliance arbitrarily repudiated Dr. Brandt's assessment of Chambers's ability to work full-time. It relied almost exclusively on Dr. Randolph's opinion to support its termination of long-term disability benefits. That opinion was flawed in that Dr. Randolph "cherry picked" Chambers's medical records, largely ignoring the medical records that supported Dr. Brandt's assessment that Chambers was plagued by persistent pain, lethargy and fatigue.

Dr. Randolph instead placed great emphasis on comments made by Dr. Waite, Chambers's treating psychiatrist, despite having been instructed to assess

19

Chambers's "physical condition in the absence of any psychiatric contribution." AR 299. Dr. Waite's notes, indicating that Chambers was not experiencing any side effects from the medications *she* had prescribed, are largely irrelevant in light of Dr. Brandt's comments that the fatigue and lethargy were caused by *other* medications.

Although Dr. Randolph was certainly entitled to consider Dr. Waite's August 10, 2010, note indicating that the methadone prescribed by Dr. Brandt was providing "very good pain relief," he failed to balance this against Dr. Brandt's notes from that same time period indicating that the pain was still worse in the morning and that the "pins and needles" sensation woke Chambers up at night, and notes from a few months later indicating that even though Chambers's pain was stable, it was always present, and Chambers was able to cope "moderately." AR 371, 447.

In concluding that Reliance acted in an arbitrary and capricious manner, the Court also takes into consideration the fact that the SSA found Chambers to be totally disabled. As previously noted, although the SSA determination is not binding, the standards for determining "total disability" are very similar under Reliance's Plan. Reliance argues that the differing outcomes are based on the fact that Reliance had additional medical evidence to consider, *i.e.* Dr. Randolph's report. However, for all of the reasons discussed above, Defendant's heavy reliance on Dr. Randolph's report is problematic.

20

Finally, the Court must consider the fact that, as discussed earlier, Reliance is operating under an inherent conflict of interest, having a financial incentive to deny claims. Having reviewed "the quality and the quantity of the medical evidence and the opinions on both sides on the issues," *Evans*, 434 F.3d at 876, the Court finds that Reliance acted in an arbitrary and capricious manner in terminating Chambers's long-term disability benefits.

## B. Full and Fair Review

Finally, Chambers argues that he was denied a full and fair opportunity to address the reasons given by Reliance for denying his appeal. Inasmuch as the Court has already found that Reliance acted in an arbitrary and capricious manner in terminating Chambers's long-term disability benefits, this argument is largely superfluous. Nevertheless, for the sake of completeness, the Court will address it.

As the Sixth Circuit explained in *Balmert v. Reliance Standard Life Insurance Company*:

> 29 U.S.C. § 1133 provides that every employee benefit plan must:
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.
>
> The essential purpose of 29 U.S.C. § 1133 is twofold: "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary." *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d

21

878, 882 (6th Cir. 2007) (emphasis omitted). Moreover, an administrator may not initially deny benefits for one reason, and then turn around and deny benefits for an entirely different reason, after an administrative appeal, without affording the claimant an opportunity to respond to the second, determinative reason for the denial of benefits. *Id*. at 882.

*Balmert*, 601 F.3d 497, 501 (6th Cir. 2010).

Two cases are illustrative. In *Castle v. Reliance Standard Life Insurance Company*, 162 F. Supp.2d 842 (S.D. Ohio 2001), the plan administrator denied a claim for disability benefits based on the fact that the claimant had failed to prove continuing disability beyond the 180-day elimination period. After the claimant filed suit, the plan administrator argued instead that the claimant was not entitled to benefits because she failed to establish that she was under the continuing care of a physician. The court refused to consider this argument because the plan administrator had not previously relied on it in denying the claim. *Id.* at 858-59.

Likewise, in *Wenner v. Sun Life Assurance Company of Canada,* 482 F.3d 878 (6th Cir. 2007), the initial termination letter referred to the claimant's failure to provide materials requested as the basis for denying the claim. But on appeal, the plan administrator stated that benefits were terminated because the claimant was not disabled by his cardiac condition. This was an entirely different, and previously unmentioned, reason. Accordingly, the court found a violation of §1133(2), and reinstated all benefits. *Id.* at 882-83.

Chambers argues that, as in *Castle* and *Wenner*, Reliance shifted its explanation for denying his claim and failed to give him a full and fair opportunity

22

to respond.  He notes that, prior to receiving Dr. Randolph's report, Reliance had never before questioned the underlying diagnoses or questioned whether he was actually taking his prescribed medications.

This case, however, is factually distinguishable.  Under the circumstances presented here, Reliance did not violate § 1133.  In contrast to the plan administrators in *Castle* and *Wenner*, Reliance did not shift its explanation for the termination of benefits on appeal.  Both the initial termination of benefits and the decision on appeal were based on Chambers's alleged failure to prove that he was incapable of performing the material duties of any occupation.  The final denial was not based on Chambers's alleged failure to offer objective proof that he had AIDS or peripheral neuropathy, or his alleged failure to prove that he was taking the prescribed medications.  It was based on his alleged failure to prove that the chronic fatigue and side effects from the medication rendered him incapable of working full-time.

Moreover, Reliance had no legal duty to provide Chambers with a copy of Dr. Randolph's report and addendum, or to give him an opportunity to respond to it prior to issuing its final decision.  *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166-67 (10th Cir. 2007) (holding that "[p]ermitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal . . . would set up an unnecessary cycle of submission, review, re-submission, and re-review."); *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245-46 (11th Cir. 2008) (holding that medical report produced

during administrative appeal need not be given to the claimant until after the appeal had been decided); *Balmert*, 601 F.3d at 502-03 (finding no procedural defect when claimant was not provided with a copy of the independent medical examiner's report during the course of an administrative appeal).

The Court therefore finds that Reliance did not deprive Chambers of a reasonable opportunity for a full and fair review of his claim for long-term disability benefits.

## IV.   Conclusion

For the reasons set forth above, the Court finds that Defendant acted in an arbitrary and capricious manner in terminating Plaintiff's long-term disability benefits.  Accordingly, the Court SUSTAINS Plaintiff's Motion for Judgment on the Administrative Record, Doc. #11, and OVERRULES Defendant's Motion for Judgment on the Administrative Record, Doc. #10.

Judgment will be entered in favor of Plaintiff and against Defendant. Defendant is directed to award Plaintiff retroactive long-term disability benefits, beginning on October 24, 2010, and continuing thereafter unless and until such time as Defendant finds him to be no longer totally disabled.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: July 12, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE